**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ANTHONY WREN, derivatively on behalf of IROBOT CORPORATION,<br><br>    Plaintiff,<br><br>    vs.<br><br>COLIN M. ANGLE, JULIE ZEILER, MOHAMAD ALI, DEBORAH ELLINGER, KAREN GOLZ, EVA MANOLIS, ANDREW MILLER, and MICHELLE STACY,<br><br>    Defendants,<br><br>    and<br><br>IROBOT CORPORATION,<br><br>    Nominal Defendant. | Case No.: 1:24-cv-11498<br><br><br><br><br>JURY TRIAL DEMANDED |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

**<u>INTRODUCTION</u>**

Plaintiff Anthony Wren ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant iRobot Corporation ("iRobot" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Colin M. Angle ("Angle"), Julie Zeiler ("Zeiler"), Mohamad Ali ("Ali"), Deborah Ellinger ("Ellinger"), Karen Golz ("Golz"), Eva Manolis ("Manolis"), Andrew Miller ("Miller"), and Michelle Stacy ("Stacy"), (collectively, the "Individual Defendants," and together with iRobot, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of iRobot, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Section 14(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Angle and Zeiler for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding iRobot, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by iRobot's current and/or former directors and officers from August 5, 2022 through January 29, 2024, both dates inclusive (the "Relevant Period").

2. iRobot is a Delaware corporation based in Bedford, Massachusetts which designs and manufactures smart-home robot vacuums and mop cleaners. The Company sells its products globally, including, but not limited to: the United States, Europe, the Middle East, and Japan. iRobot is predominantly known for its robot vacuum cleaner ("RVC"), which is sold under the "Roomba" brand name. The Company's other popular products are the Braava family of mopping robots.

3. On August 5, 2022, iRobot announced that the Company had entered into a definitive merger agreement (the "Merger Agreement") with Amazon.com Inc. ("Amazon"). The Merger Agreement provided that Amazon would acquire iRobot in an all-cash private transaction

at $61 per share, or for approximately $1.7 billion, which included iRobot's net debt (the "Merger"). Under the Merger Agreement, iRobot would become a wholly owned company of Amazon, and Defendant Angle would remain as Chief Executive Officer ("CEO") of iRobot.

4.      iRobot filed various proxy materials with the SEC throughout the Relevant Period in which the Individual Defendants maintained, among other things, that there was a high probability that the Merger would withstand regulatory antitrust scrutiny and would ultimately be approved for clearance by relevant governmental authorities such as the United States' Federal Trade Commission ("FTC") and the European Union's European Commission ("EC").

5.      On September 7, 2022, iRobot filed a definitive proxy statement with the SEC on Form DEFM14A in connection with the Merger (the "Merger Proxy Statement"). The Merger Proxy Statement was solicited by the Board of Directors of iRobot (the "Board"), including Defendants Angle, Ali, Ellinger, Golz, Manolis, Miller, and Stacy, who, as disclosed in the Merger Proxy Statement, "unanimously approved and declared advisable" the Merger Agreement.

6.      Moreover, the Individual Defendants continuously touted the iRobot's compliance with regulatory bodies, including with the FTC and the EC. The Individual Defendants further represented that iRobot complied with the Hart-Scott-Rodino Act's ("HSR Act") pre-clearance review procedures, stating that "we expect that all applicable regulatory approvals will be obtained."

7.      However, unbeknownst to iRobot's shareholders who approved the Merger, the Individual Defendants' representations about the regulatory approvability of the Merger and the adequacy of the Company's internal controls were far from reality. In fact, both domestic and international antitrust regulatory entities, including the FTC and the EC, identified approvability

issues during clearance reviews and were quite concerned about Amazon's dominant position in the smart home RVC market.

8.      By making a series of materially false and misleading statements regarding the success of completing the Merger, the Individual Defendants successfully deceived iRobot shareholders into approving the Merger. The full truth remained hidden for more than a year until news reports began exposing, in detail, the true extent of the regulatory hurdles facing the Merger.

9.      The truth only began to emerge after the markets opened on June 22, 2023, when news outlets revealed that the EC planned to launch a full-scale investigation into the Merger.

10.     On this news, iRobot's stock price fell by approximately 8.23%, or $4.12, from a closing price of $49.52 per share on June 21, 2023 to close at $45.41 per share on June 22, 2023.

11.     Approximately five months later, on November 27, 2023, the truth continued to emerge when the EC revealed that it "ha[d] informed Amazon of its preliminary view that its proposed acquisition of iRobot may restrict competition in markets for [RVCs]." Specifically, the EC counseled, "[a]s a result of [its] in-depth investigation, the [EC] is concerned that Amazon may restrict competition in the ***European Economic Area ('EEA')- wide and/or national markets for RVCs, by hampering rival RVC suppliers' ability to effectively compete.***"[1]

12.     On January 10, 2024, the truth continued to emerge when *POLITICO* reported that that Amazon did not alleviate the EC's concerns about the Merger by not providing concessions as the EC had requested. Specifically, *POLITICO* revealed that "[t]he European Union's webpage on the deal shows that the companies didn't make an offer by the end of the day on Wednesday, its last chance to tackle European Union objections that Amazon could hamper rival vacuum cleaners' sales on Amazon's online marketplace."

---

[1] Unless otherwise noted, all emphasis in bold and italics herein after is added.

13. Then, eight days later, on January 18, 2024, the *Wall Street Journal* ("WSJ") published an article revealing that "[t]he European Union's competition watchdog intends to block Amazon's $1.7 billion bid to purchase Roomba maker iRobot," citing "people familiar with the matter[.]" That same day, *Bloomberg* corroborated the WSJ by also reporting that the EC would move to block the Merger.

14. On January 19, 2024, *Bloomberg* updated its article from the previous day, reporting that the FTC was preparing a lawsuit to block the Merger.

15. On this news, iRobot's stock price fell 26.93%, or $6.36, from a closing price of $23.62 per share on January 18, 2024, to close at $17.26 per share on January 19, 2024.

16. Ten days later and before the market opened on the morning of January 29, 2024, the truth fully emerged when Amazon and iRobot revealed that the companies had entered "into a mutual agreement" to terminate the Merger.

17. Almost simultaneously that same morning, iRobot issued a press release revealing that iRobot's CEO and Chairman of iRobot's Board of Directors (the "Board")—who had served as the Company's CEO for approximately 27 years—abruptly resigned from his positions as CEO and Chairman of the Board, effective immediately. In addition, the press release revealed that iRobot planned to fire about 350 employees, constituting almost a third of iRobot's entire workforce. The press release further revealed that "[a]s part of this workforce reduction, iRobot expects to record restructuring charges totaling between $12 million and $13 million, primarily for severance and related costs, over the first two quarters of 2024, with the majority of the restructuring charges anticipated in the first quarter of 2024."

18. Later that same day, *Reuters* reported that the FTC told Amazon a week earlier that the FTC planned to block the Merger.

19.     On this news, iRobot's stock price fell $1.49 per share, or 8.77%, to close at $15.50 per share on January 29, 2024.

20.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to iRobot, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, inter alia, that: (1) the Merger would render Amazon as a dominant player in the RVC market, to which both federal and international antitrust regulators would likely scrutinize; (2) iRobot's due diligence in reviewing the Merger was wholly insufficient and ignored significant risks pertinent to regulatory approval of the Merger; (3) iRobot's statements concerning and emphasizing the likelihood of closing the Merger were significantly overstated; and (4) the Company failed to maintain adequate internal controls. As a result of the forgoing, the Company's public statements were materially false and misleading at all relevant times.

21.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

22.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO and its current Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual

Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

23.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

24.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendant Angle's and Defendant Zeiler's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Massachusetts or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is a current shareholder of iRobot. Plaintiff has continuously held iRobot common stock at all relevant times. Plaintiff is a citizen of Canada.

### Nominal Defendant iRobot

31.     iRobot is a Delaware corporation with its principal executive offices at 8 Crosby Drive, Bedford, Massachusetts 01730. iRobot shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "IRBT."

### Defendant Angle

32.     Defendant Angle co-founded iRobot. He served as the Company's Chairman of the Board from October 2008 until he resigned on January 28, 2024. He served as a Company director

from October 1992 until May 23, 2024. He served as CEO from June 1997 until he resigned on January 28, 2024. Prior to serving as the Company's CEO and Chairman, Defendant Angle served as President from November 1992 until he became CEO in June 1997. According to the Company's proxy statement on Schedule 14A filed with the SEC on April 9, 2024 (the "2024 Proxy Statement"), as of March 11, 2024, Defendant Angle beneficially owned 147,267 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024, was $10.70, Defendant Angle owned approximately $1,575,757 worth of iRobot's common stock as of that date.

33.     For the fiscal year ending December 31, 2023 (the "2023 Fiscal Year"), Defendant Angle received $6,359,892 in compensation from the Company. This included $850,000 in salary, $5,499,992 in stock awards, and $9,900 in all other compensation. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), as per the Company's Schedule 14A filed with the SEC on April 11, 2023 (the "2023 Proxy Statement"), Defendant Angle received $5,930,277 in compensation from the Company. This included $850,000 in salary, $5,071,127 in stock awards, and $9,150 in all other compensation.

34.     The 2023 Proxy Statement stated the following about Defendant Angle:

**Colin Angle**
Colin Angle, a co-founder of iRobot, has served as chairman of the board since October 2008, as chief executive officer since June 1997, and prior to that, as our president since November 1992. He has served as a director since October 1992. Mr. Angle previously worked at the National Aeronautical and Space Administration's Jet Propulsion Laboratory, where he participated in the design of the behavior controlled rovers that led to Sojourner exploring Mars in 1997. He is a director of Ixcela, Inc., a private company. Mr. Angle holds a B.S. in Electrical Engineering and an M.S. in Computer Science, both from the Massachusetts Institute of Technology ("MIT").

35.     Upon information and belief, Defendant Angle is a citizen of Massachusetts.

**Defendant Zeiler**

36.     Defendant Zeiler has served as the Company's Executive Vice President and CFO since May 2020. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Zeiler beneficially owned 35,610 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024, was $10.70, Defendant Zeiler owned approximately $381,027 worth of iRobot stock as of that date.

37.     For the 2023 Fiscal Year, Defendant Zeiler received $2,359,899 in compensation from the Company. This included $500,000 in salary, $125,000 in bonuses, $1,724,999 in stock awards, and $9,900 in all other compensation. For the 2022 Fiscal Year, Defendant Zeiler received $1,890,648 in compensation from the Company. This included $500,000 in salary, $1,381,498 in stock awards, and $9,150 in all other compensation.

38.     The 2024 Proxy Statement stated the following about Defendant Zeiler:

**Julie Zeiler** has served as our executive vice president and chief financial officer since May 2020, overseeing the Company's financial operations, investor relations and facilities organizations. Prior to being appointed chief financial officer, Ms. Zeiler served as the Company's vice president of finance since joining the Company in January 2017. In this position, she led the Company's financial planning and analysis, and treasury functions. Prior to joining iRobot, Ms. Zeiler served in a number of senior financial leadership positions at Boston Scientific Corporation from 1996 to 2017 that included its global operations, European business and major product lines. In addition, her experience includes financial management roles at Digital Equipment Corporation from 1987 to 1996. Ms. Zeiler holds a B.A. in Economics and English from Albion College.

39.     Upon information and belief, Defendant Zeiler is a citizen of Massachusetts.

**Defendant Ali**

40.     Defendant Ali has served as a Company director since August 2015. He currently serves as a member of the Compensation and Talent Committee and as the Chair of the Nominating and Corporate Governance Committee. According to the Company's 2024 Proxy Statement, as of March 11, 2024, Defendant Ali beneficially owned 25,378 shares of the Company's common

stock. Given that the price per share of the Company's common stock at the close of trading on

March 11, 2024 was $10.70, Defendant Ali owned approximately $271,545 worth of iRobot stock

as of that date.

41.    For the 2023 Fiscal Year, Defendant Ali received $272,468 in compensation from

the Company. This included $72,500 in fees earned or paid in cash and $199,968 in stock awards.

For the 2022 Fiscal Year, Defendant Ali received $276,056 in compensation from the Company.

This included $76,058 in fees earned or paid in cash and $199,998 in stock awards.

42.    The Company's 2024 Proxy Statement stated the following about Defendant Ali:

***Mohamad Ali***

Mohamad Ali has served as a director since August 2015 and brings extensive
experience with capital allocation in technology companies, as well as strategic
software development, including cloud infrastructure and data analytics. Mohamad
Ali has served as Senior Vice President (SVP) and Chief Operating Officer for IBM
Consulting since October 2023, where he is responsible for the global operational
performance of IBM Consulting, including Global Delivery, Cybersecurity
services, asset development and scaling AI-enabled solutions that make greater use
of IBM technology. Previously, Mr. Ali was chief executive officer and a director
of International Data Group, Inc. (IDG), a leading market intelligence and demand
generation company focused on the technology industry, from August 2019 to May
2023. Prior to IDG, he served as the president, chief executive officer and director
of Carbonite, Inc., a global leader in data protection, since 2014. Mr. Ali
successfully led Carbonite's continued growth, serving the ever-evolving
technological needs of small and midsize businesses and consumers. Previously,
Mr. Ali served as chief strategy officer at Hewlett-Packard, a manufacturer of
computers and enterprise products, from 2012 to 2014 and president of Avaya
Global Services, an enterprise communications company. He also served in senior
leadership roles at IBM Corporation ("IBM"), a multinational technology and
consulting company, where he acquired numerous companies to build IBM's
analytics and big data business. Mr. Ali is a director of Henry Schein (Nasdaq:
HSIC), the world's largest provider of health care solutions to office-based dental
and medical practitioners, as well as Oxfam America, Massachusetts Technology
Leadership Council, and the WGBH Educational Foundation, each a nonprofit
entity, and previously served on the board of directors of Carbonite, Inc., City
National Corporation, and City National Bank. Mr. Ali was named 2022 EY
Entrepreneur of the Year for New England, 2018 CEO of the Year by
Massachusetts Technology Leadership Council, and finalist in America's 1988
National Science Talent Search. Mr. Ali holds a B.S. and an M.S. in Electrical
Engineering, both from Stanford University.

43.     Upon information and belief, Defendant Ali is a citizen of Massachusetts.

**Defendant Golz**

44.     Defendant Golz has served as a Company director since November 2021. She currently serves as the Chair of the Audit Committee. According to the Company's 2024 Proxy Statement, as of March 11, 2024, Defendant Golz beneficially owned 6,285 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $10.70, Defendant Golz owned approximately $67,250 worth of iRobot stock as of that date.

45.      For the 2023 Fiscal Year, Defendant Golz received $279,968 in compensation from the Company. This included $80,000 in fees earned or paid in cash and $199,968 in stock awards. For the 2022 Fiscal Year, Defendant Golz received $274,950 in compensation from the Company. This included $74,952 in fees earned or paid in cash and $199,998 in stock awards.

46.     The Company's 2024 Proxy Statement stated the following about Defendant Golz:

***Karen Golz***
Karen M. Golz is a retired partner from Ernst & Young ("EY"), a public accounting firm, where she held various senior leadership positions during her tenure at the firm, including most recently as Global Vice Chair, Japan from July 2016 to June 2017, and prior thereto, from July 2010 to June 2016, as Global Vice Chair, Professional Practice. Ms. Golz also served on EY's Global Risk Management Executive Committee, which was charged with risk management across EY's global network, from 2008 to 2016. Ms. Golz currently serves as senior advisor to The Boston Consulting Group's Audit and Risk Committee, a role she has held since August 2017, and as a principal for K.M. Golz Associates, LLC, a consulting services company, since August 2017. She also sits on the Board of Directors of the University of Illinois Foundation. Ms. Golz is also a National Association of Corporate Directors Board Leadership Fellow. She holds a B.S. in Accountancy, summa cum laude, from the University of Illinois, Urbana-Champaign and is a certified public accountant ("CPA").

47.     Upon information and belief, Defendant Golz is a citizen of Massachusetts.

**Defendant Manolis**

48.     Defendant Manolis has served as a Company director since July 2019. She also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the Company's 2024 Proxy Statement, as of March 11, 2024, Defendant Manolis beneficially owned 11,713 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $10.70, Defendant Manolis owned approximately $125,329 worth of iRobot stock as of that date.

49.     For the 2023 Fiscal Year, Defendant Manolis received $273,460 in compensation from the Company. This included $77,500 in fees earned or paid in cash and $199,968 in stock awards. For the 2022 Fiscal Year, Defendant Manolis received $273,460 in compensation from the Company. This included $73,462 in fees earned or paid in cash and $199,998 in stock awards.

50.     The Company's 2024 Proxy Statement stated the following about Defendant Manolis:

*Eva Manolis*
Eva Manolis has served as a director since July 2019. She brings more than 30 years of product development and global ecommerce experience within the consumer technology space to the iRobot board. Ms. Manolis served in a variety of executive roles at Amazon.com, Inc. from 2005 through 2016, where she was successful in developing and growing customer adoption of technologies, products, programs and services across a variety of categories, including consumer electronics. Most recently, Ms. Manolis served as vice president of consumer shopping at Amazon.com, Inc. from 2010 until 2016 with responsibility for worldwide innovative shopping experiences, including the development of features and services for the company's mobile app and website on a global scale. Prior to that, Ms. Manolis served as vice president of web and mobile retail applications from 2008 to 2010 and vice president of global retail applications from 2005 to 2008. Ms. Manolis also founded Shutterfly, Inc. in 1999 and served as executive vice president of products, services and strategy until 2002. At Shutterfly, she was responsible for the vision, architecture, design and development of the company's website from inception to profitability. In addition to her service on the iRobot board of directors, she also currently serves on the board of directors at Fair Isaac Corporation and previously served on the board of directors at Shutterfly, Inc.

51.     Upon information and belief, Defendant Manolis is a citizen of Washington.

**Defendant Miller**

52.     Defendant Miller has served as a Company director since September 2016. He has also served as the Chairman of the Board since January 2024. Additionally, Defendant Miller serves as a member of the Audit Committee, served as the Chair of the Audit Committee prior to being named Chair of the Board, and served as Chair of the Transaction Committee formed in May 2022 in connection with the Merger. According to the Company's 2024 Proxy Statement, he is designated as a "Financial Expert." According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Miller beneficially owned 12,102 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024, was $10.70, Defendant Miller owned approximately $129,491 worth of iRobot stock as of that date.

53.     For the 2023 Fiscal Year, Defendant Miller received $292,468 in compensation from the Company. This included $92,500 in fees earned or paid in cash and $199,968 in stock awards. For the 2022 Fiscal Year, Defendant Miller received $273,460 in compensation from the Company. This included $73,462 in fees earned or paid in cash and $199,998 in stock awards.

54.     The Company's 2024 Proxy Statement stated the following about Defendant Miller:

> ***Andrew Miller***
> Andrew Miller has served as a director since September 2016 and brings critical financial leadership as well as software, cloud infrastructure and Internet of Things ("IoT") experience to iRobot as the Company continues to grow its consumer business globally and focus on the connected home. Mr. Miller most recently served as executive vice president and chief financial officer of PTC, a provider of software technology platforms and solutions, from early 2015 until May 2019. At PTC, he was responsible for global finance, tax and treasury, investor relations, information technology, pricing, corporate real estate, and customer administration. From 2008 to 2015, Mr. Miller served as chief financial officer of Cepheid, a high-

growth molecular diagnostics company, where he built world-class finance and information technology teams and a nationally recognized investor relations program. Mr. Miller has also served in financial leadership roles at Autodesk, MarketFirst Software, Cadence Design Systems, and Silicon Graphics. In addition to his service on the iRobot board of directors, Mr. Miller serves as a director on the board of Verint Systems (Nasdaq: VRNT), a global software and cloud provider of actionable intelligence solutions, where he is a member of the board's audit committee. Mr. Miller also serves on the board of Vontier Corporation (NYSE: VNT), a global industrial technology company focused on smarter transportation and mobility, where he is chair of the audit committee and a member of the compensation committee. He is also a former director of United Online, where he chaired the audit committee and served on the compensation committee. Mr. Miller holds a B.S. in Commerce with an emphasis in Accounting from Santa Clara University and was a CPA.

55.     Upon information and belief, Defendant Miller is a citizen of California.

**Defendant Stacy**

56.     Defendant Stacy has served as a Company director since August 2014. She serves as the Chair of the Compensation and Talent Committee, a member of the Nominating and Corporate Governance Committee, and served as a member of the Transaction Committee, which was formed in May 2022 in connection with the Merger. According to the Company's 2024 Proxy Statement, as of March 11, 2024, Defendant Stacy beneficially owned 20,457 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024, was $10.70, Defendant Stacy owned approximately $218,890 worth of iRobot stock as of that date.

57.     For the 2023 Fiscal Year, Defendant Stacy received $279,968 in compensation from the Company. This included $80,000 in fees earned or paid in cash and $199,968 in stock awards. For the 2022 Fiscal Year, Defendant Stacy received $277,979 in compensation from the Company. This included $77,981 in fees earned or paid in cash and $199,998 in stock awards.

58.     The Company's 2024 Proxy Statement stated the following about Defendant Stacy:

*Michelle Stacy*

15

Michelle V. Stacy has served as a director since August 2014. During her five-year tenure as president at Keurig Inc., a division of Keurig Green Mountain, Inc., from 2008 to 2013, the company's revenue grew from $493 million in 2008 to $4.3 billion in 2013. Ms. Stacy has also served as lead executive director of Coravin, Inc. and a director of LCP Edge Holdco, LLC (Hydrafacial), Young Innovations Inc., Flex Pharma and Tervis Inc. Ms. Stacy currently serves on the board of Bellwether Coffee Co., Miltons Bakery, and SkullCandy. Ms. Stacy is a recognized expert on identifying strategies to successfully build top line growth for global brands. She holds a B.S. from Dartmouth College and an M.S. in Management from J.L. Kellogg Graduate School of Management — Northwestern University, and is bilingual in French and English.

59.     Upon information and belief, Defendant Stacy is a citizen of Massachusetts.

**Defendant Ellinger**

60.     Defendant Ellinger served as a Company director from November 2011 until June 30, 2023. Prior to her resignation, Defendant Ellinger served as the Chair of the Nominating and Corporate Governance Committee and served on the Transaction Committee, which was formed in May 2022 in connection with the Merger.

61.     For the 2023 Fiscal Year, Defendant Ellinger received $232,468 in compensation from the Company. This included $32,500 in fees earned or paid in cash and $199,968 in stock awards. For the 2022 Fiscal Year, Defendant Ellinger received $264,998 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $199,998 in stock awards.

62.     The Company's 2023 Proxy Statement stated the following about Defendant Ellinger:

*Deborah Ellinger*
Deborah G. Ellinger has served as a director since November 2011. Ms. Ellinger is also a director of Tupperware Brands Corporation (NYSE: TUP), a leading global consumer products company, and is a senior advisor to the Boston Consulting Group. She was the president and CEO of Ideal Image, a chain of 130 medical spas providing non-surgical cosmetic procedures across the U.S. and Canada, from 2016 until her retirement in March 2018; chairman and chief executive officer of The Princeton Review, a company which assists students globally in test preparation and tutoring, from 2012 to 2014; president of Restoration Hardware, a luxury home furnishings retailer, from 2008 to 2009; and chief executive officer of Wellness Pet

Food, a natural pet-food company, from 2004 to 2008. Ms. Ellinger led each of those companies while they were owned by two private equity firms, and three of the four transitioned to new ownership, yielding three to seven times return on capital to investors. Previously, she served as an executive vice president at CVS Pharmacy, a senior vice president at Staples, and a partner at The Boston Consulting Group, and began her career with Mellon Financial Corporation. Ms. Ellinger also serves on the board of the WomenCorporateDirectors Foundation, a nonprofit entity, and is a former director of Covetrus, Interpublic Group, The Princeton Review, Sealy Corporation, National Life Group, and several private companies. Her assignments have taken her all over the world; she has lived and worked in Europe, Asia, and America. Ms. Ellinger is qualified as a Barrister-at-Law in London, as a member of the Inner Temple. She holds an M.A. and B.A. in Law and Mathematics from the University of Cambridge, England.

63.     Upon information and belief, Defendant Ellinger is a citizen of Florida.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

64.     By reason of their positions as officers and/or directors of iRobot and because of their ability to control the business and corporate affairs of iRobot, the Individual Defendants owed iRobot and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage iRobot in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of iRobot and its shareholders so as to benefit all shareholders equally.

65.     Each director and officer of the Company owes to iRobot and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of iRobot, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

67.     To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

68.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of iRobot, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised iRobot's Board at all relevant times.

69.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

70.     To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of iRobot were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to iRobot's own Code of Business Conduct and Ethics ("Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how iRobot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of iRobot and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that iRobot's operations would comply with all applicable laws and iRobot's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.      Each of the Individual Defendants further owed to iRobot and the shareholders the duty of loyalty requiring that each favor iRobot's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

72.      At all times relevant hereto, the Individual Defendants were the agents of each other and of iRobot and were at all times acting within the course and scope of such agency.

73.      Because of their advisory, executive, managerial, and directorial positions with iRobot, each of the Individual Defendants had access to adverse, non-public information about the Company.

74.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by iRobot.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

75.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

76.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

77.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of iRobot was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

78.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of iRobot and was at all times acting within the course and scope of such agency.

## IROBOT'S CODE OF BUSINESS CONDUCT AND ETHICS

80.     The Company's Code of Ethics applies to the Company's directors, officers, and employees and it seeks "to aid the Company's directors, employees and contractors in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties." Further, Defendant Angle stated in a signed prefatory letter, in relevant part: "[o]ur Code is a reaffirmation of the Company's commitment to conducting its business ethically and to observing applicable laws, rules and regulations." Under the heading, "Standards of Conduct" the Code of Ethics states, "***For our Shareholders*** – we are committed to pursuing profitable growth, without taking undue risk, to exercising financial discipline in the deployment of our assets and resources, and ***to making accurate, timely, and clear disclosures in all public reports and communications***."

81.     At the outset, the Code of Ethics notes that "[e]ach director, employee and contractor has a personal responsibility to ensure that his or her conduct protects and promotes both the letter of the Code and its spirit of ethical conduct."

82.     The Code of Ethics provides, under the heading "Accuracy of Records," in relevant part:

> The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to iRobot's continued and future business success.

> No director, employee or contractor may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, employee or contractor may create any false or artificial documentation or book entry for any transaction entered into by the Company.

83.     Under the heading "Confidentiality," the Code of Ethics states the following, in relevant part:

"Confidential information" includes all non-public information that might be of use to competitors or harmful to the Company or its customers if disclosed. Directors, employees and contractors may not disclose or distribute the Company's confidential information, except when disclosure is authorized by the Company or required by applicable law, rule or regulation or pursuant to an applicable legal proceeding. Directors, employees and contractors shall use confidential information solely for legitimate company purposes.

84.     Under the heading "Conflicts of Interest," the Code of Ethics states the following,

in relevant part:

In most, if not all, cases … our directors, employees and contractors must avoid situations that present a potential or actual conflict between their personal interests and the Company's interests.

A "conflict of interest" occurs when a director's, employee's or contractor's personal interest interferes with the Company's interests. Conflicts of interest may arise in many situations. For example, conflicts of interest can arise when a director, employee or contractor takes an action or has an outside interest, responsibility or obligation that may make it difficult for him or her to perform the responsibilities of his or her position objectively and/or effectively in the Company's best interests.

85.     Under the heading "Compliance with Laws, Rules and Regulations," the Code of

Ethics states the following, in relevant part:

iRobot seeks to conduct its business in compliance with both the letter and the spirit of applicable laws, rules and regulations... No director, employee or contractor shall engage in any unlawful activity in conducting the Company's business or in performing his or her day-to-day company duties, nor shall any director, employee or contractor instruct others to do so.

86.     Under the heading "Quality of Public Disclosures," the Code of Ethics states the

following, in relevant part:

The Company is committed to providing its stockholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and

objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management is primarily responsible for monitoring the Company's public disclosures.

87.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and law.

## IROBOT'S AUDIT COMMITTEE CHARTER

88.     The Company's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

89.     Per the Audit Committee Charter, under the heading "General Statement of Purpose," the Audit Committee Charter outlines the Audit Committee's responsibilities, in relevant part:

> The purposes of the Audit Committee of the Board of Directors (the "Audit Committee") of iRobot Corporation (the "Company") are to:
>
> • oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;
>
> • take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors;
>
> • prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement;

- oversee the Company's compliance with legal and regulatory requirements; and

- oversee the internal audit function of the Company to ensure compliance with accounting, financial reporting, legal or other regulatory requirements.

90.     Under the heading "Responsibilities and Authority," the Audit Committee Charter

outlines, in relevant part:

**Audited Financial Statements and Annual Audits**

- The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditor and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

- The Audit Committee shall review and discuss with management . . . the Company's annual audited financial statements, including (1) all critical accounting policies and practices used or to be used by the Company, (2) the Company's disclosures under "Management's Discussion and Analysis of Financial Conditions and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements, including any significant, non-routine transactions or judgments

- The Audit Committee must review:

(i) any analyses prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

(ii) major issues as the adequacy of the Company's internal controls and any special audit steps adopted in light of any material control deficiencies;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

- The Audit Committee shall review and discuss with the independent auditor (outside of the presence of management) how the independent auditor plans to handle its responsibilities under the Private Securities Litigation Reform Act of 1995, and request assurance from the auditor that Section 10A of the Private Securities Litigation Reform Act of 1995 has not been implicated

- The Audit Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto . . . . includ[ing] (1) any difficulties encountered by the auditor in the course of performing its audit work, including any restrictions on the scope of its activities or its access to information, (2) any significant disagreements with management and (3) a discussion of the responsibilities, budget and staffing of the Company's internal audit function

                    *            *            *

- The Audit Committee shall also review and discuss with the independent auditors the report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act.

- As brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

- Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditor of the matters required to be discussed by SAS 61, and (3) with the independent auditor concerning the independent auditor's independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

- The Audit Committee shall prepare the Audit Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

91.    The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the

Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

92.     iRobot is a Delaware corporation based in Bedford, Massachusetts, which designs and manufactures smart-home robot vacuums and mop cleaners. The Company sells its products globally, including throughout the United States, Europe, the Middle East, and Japan. iRobot is predominantly known for its RVC products, which are sold under the "Roomba" brand name, and the Braava family of mopping robots.

93.     On August 5, 2022, iRobot issued a joint press release with Amazon, announcing that "Amazon… and iRobot… have entered into a definitive merger agreement under which Amazon will acquire iRobot." The deal to take iRobot private was announced as an all-cash deal valued at approximately $1.7 billion, or $61 per share, including iRobot's net debt. iRobot stood to remain as the surviving company, wholly owned by Amazon, with Defendant Angle remaining as CEO of iRobot.

94.     iRobot filed various proxy materials with the SEC throughout the Relevant Period in which the Individual Defendants maintained, among other things, that there was a high probability that the Merger would withstand regulatory scrutiny and would ultimately be approved for clearance by governmental authorities.

95.     On September 7, 2022, iRobot filed the Merger Proxy Statement. The Merger Proxy Statement was solicited by the Board, including Defendants Angle, Ali, Ellinger, Golz, Manolis, Miller, and Stacy, who, as disclosed in the Merger Proxy Statement, "unanimously approved and declared advisable" the Merger Agreement.

96.     Moreover, the Individual Defendants continuously touted their compliance with regulatory bodies, including the FTC and EC. iRobot maintained that the Company complied with HSR Act pre-clearance review procedures, stating that "we expect that all applicable regulatory approvals will be obtained."

97.     However, unbeknownst to iRobot's shareholders who approved the Merger, the Individual Defendants' representations about the regulatory approvability of the Merger and the adequacy of the Company's internal controls were far from reality. In fact, domestic and international antitrust regulatory entities—including both the FTC and the EC—identified approvability issues during clearance reviews, were largely concerned about Amazon's dominant position in the smart-home RVC market, and ultimately sought to block the Merger entirely.

98.     By making a series of false and misleading statements regarding the success of achieving regulatory clearance for the Merger among other things, the Individual Defendants successfully deceived iRobot shareholders into approving the Merger. The full truth remained hidden for over a year until news reports began exposing, in detail, the true extent of the regulatory hurdles facing the Merger.

**False and Misleading Statements**

*August 5, 2022 Joint Press Release*

99.     Before the market opened on August 5, 2022, the Company and Amazon published a joint press release stating "Amazon . . . and iRobot . . . have entered into a definitive merger agreement under which Amazon will acquire iRobot." The statement expressed, among other things, that "Amazon will acquire iRobot for $61 per share in an all-cash transaction valued at approximately $1.7 billion, including iRobot's net debt," and "[o]n completion, [Defendant] Angle will remain as CEO of iRobot."

*September 7, 2022 Merger Proxy Statement*

100.     On September 7, 2022, iRobot filed the Merger Proxy Statement in connection with the Merger Agreement. The Merger Proxy Statement downplayed the risk that applicable domestic and international regulators would scrutinize and ultimately seek to block the Merger, stating in relevant part:

> iRobot and Amazon.com have agreed to use their respective reasonable best efforts to consummate the transactions contemplated by the merger agreement (including the merger) no later than the outside date (as defined herein), including obtaining any applicable regulatory approvals and satisfying all statutory waiting period requirements, subject to certain specified limitations under the merger agreement. These approvals include approval under the HSR Act, clearance by the [EC], and certain other merger filings or clearances that may be required or advisable in other jurisdictions. Although ***we expect that all applicable regulatory approvals will be obtained***, the merger cannot be consummated until after expiration or termination of the applicable waiting period under the HSR Act, and after the mandatory approval requirements outside of the United States have been obtained under applicable antitrust and foreign investment laws.

> \*          \*          \*

> Although ***Amazon.com and iRobot believe that the merger will not violate the antitrust or foreign investment laws and expect that all required regulatory clearances and approvals will be obtained***, Amazon.com and iRobot cannot assure that these regulatory clearances and approvals will be timely obtained, obtained at all or that the granting of these regulatory clearances and approvals will not involve the imposition of additional conditions, restrictions, qualifications, requirements or

limitations on the completion of the merger, including the requirement to divest assets, license or hold separate assets or terminate existing relationships and contractual rights, or agree to other remedies, or require changes to the terms of the Merger Agreement, or that a challenge to the merger on antitrust or foreign investment grounds will not be made, or if such challenge is made, what the result will be. These conditions or changes could result in the conditions to the merger not being satisfied. There is currently no way to predict how long it will take to obtain all of the required regulatory approvals or whether such approvals will ultimately be obtained and there may be a substantial period of time between the approval of the proposal to approve and adopt the merger agreement by stockholders and the completion of the merger.

101. The Merger Proxy Statement also contained a prefatory letter signed by Defendant Angle, in which he stated that the Board "unanimously approved and declared advisable the merger agreement." In discussing how the board came to this conclusion, and in discussing their relevant due diligence efforts in reviewing the Merger Agreement, the Merger Proxy Statement stated under the heading, "Background of the Merger":

> During the first and second quarters of 2022, the iRobot board of directors and iRobot management *actively assessed* rapidly evolving industry, global and regional macroeconomic trends and geopolitical dynamics, *intensifying competitive conditions* and inflationary price pressures relevant to iRobot's business, performance and long-term prospects.

102. As a result of "actively assess[ing]" the "intensifying competitive conditions," the Merger Proxy Statement represented that the Individual Defendants determined that unanimous approval of the Merger Agreement remained favorable.

103. The Merger Proxy Statement further contained misrepresentations regarding the Board's investigatory duties performed during the due diligence period in connection with the Merger, stating, *inter alia*, that: (1) "[o]n May 25, 2022, members of iRobot management met with members of Amazon.com management to discuss high-level due diligence mattes in connection with the proposed transaction"; (2) during a May 26, 2022 Board meeting, the Company's Board had "authorized iRobot management to continue to engage in high-level due diligence with

Amazon.com in relation to the proposed transaction"; (3) "[o]n June 1, 2022, members of iRobot management again met with members of Amazon.com management to further discuss high-level due diligence matters in relation to the proposed transaction"; (4) on June 9, 2022, "Amazon.com . . . reaffirmed that satisfactory progress on due diligence was being made and that it was continuing to lean toward making a non-binding proposal in the near term"; and (5) that "iRobot management and representatives of Qatalyst Partners and Goodwin proceeded to conduct multiple due diligence management sessions with representatives of Amazon.com from July 6, 2022 through July 18, 2022."

### *October 17, 2022 Form 8-K*

104.    On October 17, 2022, iRobot filed a current report on Form 8-K with the SEC, disclosing the stockholder vote ratifying the Merger Agreement, which occurred that same day ("October 17th 2022 8-K"). The October 17th 8-K stated that "the transaction is expected to close promptly after all required regulatory clearances have been received, and subject to the satisfaction of other customary closing conditions." The October 17th 2022 8-K did not disclose any further pre-clearance regulatory issues, thereby downplaying the risk that applicable regulators, both domestic and international, would not approve the Merger.

### *November 10, 2022 Q3 2022 10-Q*

105.    On November 10, 2022, iRobot released its third quarter 2022 financial results in a Form 10-Q filing with the SEC ("Q3 2022 10-Q"). The Q3 2022 10-Q was signed and certified by Defendants Angle and Zeiler, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the financial statements contained in the Q3 2022 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

106.    The Q3 2022 10-Q stated with respect to Merger Agreement contingencies, that:

The Merger is conditioned upon, among other things, the expiration of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, … certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, and other customary closing conditions. On September 19, 2022, the Company and Amazon each received a request for additional information and documentary material (the "Second Request") from the [FTC] in connection with the FTC's review of the transactions contemplated by the Merger Agreement. The effect of the Second Request is to extend the waiting period imposed by the HSR Act, until 30 days after the Company and Amazon have substantially complied with the Second Request, unless that period is extended voluntarily by the parties or terminated sooner by the FTC. The Company and Amazon continue to work cooperatively with the FTC staff in its review of the Merger. Completion of the Merger remains subject to the expiration or termination of the waiting period under the HSR Act.

***February 14, 2023 Form 10-K***

107.    On February 14, 2023, iRobot filed its annual report on Form 10-K for the 2022 Fiscal Year with the SEC (the "2022 10-K"), wherein the Company repeated the same contingencies referenced in ¶ 106 which continued to downplay the risk of regulatory hurdles that the Merger faced from domestic and international regulatory actors and agencies.

108.    Defendants Angle, Zeiler, Ali, Ellinger, Golz, Manolis, Miller, and Stacy signed the 2022 10-K and the 2022 10-K contained SOX certifications, signed by Defendants Angle and Zeiler, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act, attesting to the accuracy of the financial statements contained in the 2022 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

***April 11, 2023 Proxy Statement***

109.    On April 11, 2023, iRobot filed the 2023 Proxy Statement with the SEC, notifying shareholders of the 2023 Annual Meeting of Shareholders, to be held on May 26, 2023. Defendants

Angle, Ali, Ellinger, Golz, Manolis, Miller, and Stacy solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

110.     The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Golz, Miller, and Stacy to the Board; (2) the ratification of the appointment of PricewaterhouseCoopers LLP ("PwC") as the Company's independent public accountant for the 2023 Fiscal Year; (3) the compensation of the Company's named executive officers on a non-binding, advisory basis; and (4) the frequency, on a non-binding, advisory basis, of future non-binding, advisory votes on the compensation of iRobot's named executive officers.

111.     Regarding the Company's Code of Ethics, the 2023 Proxy Statement provided, in relevant part:

> We have adopted a "code of ethics," as defined by regulations promulgated under the Securities Act of 1933, as amended, and the Exchange Act, that applies to all of our directors and employees worldwide, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions. A current copy of the Code of Business Conduct and Ethics is available at https://investor.irobot.com/corporate-governance/highlights. . . . We intend to disclose any amendment to or waiver of a provision of the Code of Business Conduct and Ethics that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website available at https://investor.irobot.com/corporate-governance/highlights and/or in our public filings with the SEC.

112.     Regarding "The Board of Directors' Role in Risk Oversight," the 2023 Proxy Statement provided, in relevant part:

> The board of directors oversees our risk management process. This oversight is primarily accomplished through the board of directors' committees and management's reporting processes, including receiving regular reports from members of senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, and strategic and reputational risks. The audit committee focuses on risk related to accounting,

internal controls, financial and tax reporting, privacy and cybersecurity. The audit committee also assesses economic and business risks and monitors compliance with ethical standards. The compensation and talent committee identifies and oversees risks associated with our executive compensation policies and practices, and the nominating and corporate governance committee identifies and oversees risks associated with director independence, related party transactions and the implementation of corporate governance policies.

113.    Defendants Angle, Ali, Ellinger, Golz, Manolis, Miller, and Stacy caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Merger would render Amazon as a dominant player in the RVC market, to which both federal and international antitrust regulators would likely scrutinize; (2) iRobot's due diligence in reviewing the Merger was wholly insufficient and ignored significant risks pertinent to regulatory approval of the Merger; (3) iRobot's statements concerning and emphasizing the likelihood of closing the Merger were significantly overstated; and (4) the Company failed to maintain adequate internal controls. As a result of the forgoing, the Company's public statements were materially false and misleading at all relevant times.

114.    The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as the Individual Defendants violated the Code of Ethics, including by allowing false and misleading statements to be issued to the investing public. The Code of Ethics was further violated by the Individual Defendants not seeking waivers for their violations of the Code of Ethics.

115.    As a result of Individual Defendants Angle, Ali, Ellinger, Golz, Manolis, Miller, and Stacy causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Individual Defendants Golz, Miller, and Stacy to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the appointment of PwC as the Company's independent public accountant for the 2023 Fiscal Year;

(3) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers; and (4) set, on a non-binding advisory basis, the frequency of future non-binding, advisory votes on the compensation of iRobot's named executive officers.

### *May 9, 2023 Q1 2023 10-Q*

116. On May 9, 2023, iRobot filed a quarterly report on Form 10-Q for the quarter ended April 1, 2023 with the SEC ("Q1 2023 10-Q"), wherein the Company repeated the same contingencies referenced in ¶ 106 which continued to downplay the risk of regulatory hurdles that the Merger faced from domestic and international regulatory actors and agencies.

117. The Q1 2023 10-Q was signed by Defendants Angle and Zeiler and contained SOX certifications signed by Defendants Angle and Zeiler, attesting to the accuracy of the financial statements contained within, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

118. The statements referenced above in ¶¶ 99-108 and 116-117 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Merger would render Amazon as a dominant player in the RVC market, to which both federal and international antitrust regulators would likely scrutinize; (2) iRobot's due diligence in reviewing the Merger was wholly insufficient and ignored significant risks pertinent to regulatory approval of the Merger; (3) iRobot's statements concerning and emphasizing the likelihood of closing the Merger were significantly overstated; and (4) the Company failed to maintain adequate internal controls. As a result of the forgoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Begins to Emerge While False and Misleading Statements Continue**

*June 22, 2023 Reuters Article*

119.    Just after the start of trading on the morning of June 22, 2023, news outlets reported that the EC planned on heavily scrutinizing and investigating the Merger. For instance, *Reuters* reported in an article titled, "Amazon's iRobot deal faces EU antitrust investigation, sources say," that the EC was scheduled to launch an extensive investigation into the Merger, in relevant part:

> Amazon's . . . $1.7 billion acquisition of robot vacuum cleaner maker iRobot . . . faces a full-scale EU antitrust investigation, people familiar with the matter said, weeks after the U.S. online retail giant won UK approval for the deal.
>
> *            *            *
>
> The [EC] is scheduled to launch a four-month investigation following the end of its preliminary review of the deal on July 6, the people said.
> Amazon is unlikely to offer remedies during this initial phase, one of the people said. It has a final shot in the next few days at convincing the EU competition watchdog that the deal is pro-competitive, although the odds against it are high.
>
> The [EC] and Amazon declined to comment. Amazon has previously said the vacuum cleaner market is very competitive, with lots of Chinese players.

120.    On this news, iRobot's stock price fell by approximately 8.23%, or $4.12, from a closing price of $49.52 per share on June 21, 2023, to close at $45.41 per share on June 22, 2023.

*July 25, 2023 Joint Press Release*

121.    On July 25, 2023, iRobot and Amazon issued a joint press release announcing certain amendments to the merger agreement (the "Merger Amendment Announcement"). In the Merger Amendment Announcement, the companies announced, "they have agreed to amend the existing terms of their merger agreement to reflect a change to the price per share," and as such, "Amazon will pay $51.75 per share revised from $61.00 per share" (the "Amended Merger Agreement").

122.    Defendant Angle stated the following in the Merger Amendment Announcement, in relevant part:

iRobot is taking on new financing that we believe is sufficient to support our operations ***in a hyper competitive environment*** and meet our liquidity needs as well as pay off iRobot's existing debt. This new financing is the outcome of a thorough process and represents the best terms reasonably obtainable on additional financing to support our operations.

123. Moreover, the Merger Amendment Announcement continued to downplay the EC's probe into the Merger, stating, in relevant part:

Completion of the transaction remains subject to customary closing conditions, including regulatory approvals and approval of the amended merger agreement by iRobot's stockholders[.]

*          *          *

Amazon and iRobot are working cooperatively with the relevant regulators in their review of the merger.

***August 8, 2023 Q2 2023 10-Q***

124. On August 8, 2023, iRobot released its second quarter 2023 financial results in a Form 10-Q filing with the SEC ("Q2 2023 10-Q"), in which the Company stated, with respect to Merger Agreement contingencies, the following statements downplaying the regulatory risks they faced, which read in relevant part:

The Merger is conditioned upon, among other things, the adoption of the Amended Merger Agreement by holders of a majority of the outstanding shares of Common Stock, the expiration of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, … certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, and other customary closing conditions. On September 19, 2022, the Company and Amazon each received a request for additional information and documentary material (the "Second Request") from the [FTC] in connection with the FTC's review of the transactions contemplated by the Amended Merger Agreement. The effect of the Second Request is to extend the waiting period imposed by the HSR Act, until 30 days after the Company and Amazon have substantially complied with the Second Request. Completion of the Merger remains subject to the expiration or termination of the waiting period under the HSR Act.

On April 18, 2023, Amazon notified the Merger to the UK Competition and Markets Authority (the "CMA"). On June 16, 2023, the CMA announced a decision to approve unconditionally the Merger. On June 1, 2023, Amazon notified the

Merger to the [EC]. On July 6, 2023, the [EC] referred the Merger for an in-depth Phase 2 review which currently has a deadline of December 13, 2023.

125.    The Q2 2023 10-Q was signed by Defendants Angle and Zeiler and contained SOX certifications signed by Defendants Angle and Zeiler, attesting to the accuracy of the financial statements contained within, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

### *August 24, 2023 Amended Merger Proxy Statement*

126.    On August 24, 2023, iRobot filed a definitive proxy statement on Form DEFM14A with the SEC regarding the Amended Merger Agreement (the "Amended Merger Proxy Statement"). The Amended Merger Proxy Statement was solicited by Defendants Angle, Ali, Golz, Manolis, Miller, and Stacy, who, as disclosed in the Amended Merger Proxy Statement, unanimously approved the Amended Merger Agreement.

127.    The Amended Merger Proxy Statement asked shareholders to vote, "(1) 'FOR' the proposal to approve and adopt the amended merger agreement; (2) 'FOR' the approval, on an advisory (non-binding) basis, of the compensation proposal; and (3) 'FOR' the adjournment proposal."

128.    The Amended Merger Proxy Statement purported to warn shareholders of regulatory hurdles the Merger faced, yet concurrently downplayed the same regulatory risks that threatened a successful completion of the transaction, stating, in relevant part:

> iRobot and Amazon.com have agreed to use their respective reasonable best efforts to consummate the transactions contemplated by the amended merger agreement (including the merger) no later than the outside date (as defined herein), including obtaining any applicable regulatory approvals and satisfying all statutory waiting period requirements, subject to certain specified limitations under the amended merger agreement. These approvals include approval under the HSR Act, clearance by the [EC], and certain other merger filings or clearances that may be required or advisable in other jurisdictions. Although ***we expect that all applicable regulatory approvals will be obtained***, the merger cannot be consummated until after

expiration or termination of the applicable waiting period under the HSR Act, and after the mandatory approval requirements outside of the United States have been obtained under applicable antitrust and foreign investment laws.

*    *    *

Although ***Amazon.com and iRobot believe that the merger will not violate the antitrust or foreign investment laws and expect that all required regulatory clearances and approvals will be obtained***, Amazon.com and iRobot cannot assure that these regulatory clearances and approvals will be timely obtained, obtained at all or that the granting of these regulatory clearances and approvals will not involve the imposition of additional conditions, restrictions, qualifications, requirements or limitations on the completion of the merger, including the requirement to divest assets, license or hold separate assets or terminate existing relationships and contractual rights, or agree to other remedies, or require changes to the terms of the amended merger agreement, or that a challenge to the merger on antitrust or foreign investment grounds will not be made, or if such challenge is made, what the result will be. These conditions or changes could result in the conditions to the merger not being satisfied. There is currently no way to predict how long it will take to obtain all of the required regulatory approvals or whether such approvals will ultimately be obtained and there may be a substantial period of time between the approval of the proposal to approve and adopt the amended merger agreement by stockholders and the completion of the merger.

129.     The Amended Merger Proxy Statement also contained the same statements referred to in ¶ 102 and ¶ 103, *supra*, addressing the Board's rationale behind their unanimous determination in favor of the Amended Merger Agreement, relying in part on their active assessment of the "intensifying competitive conditions." Further, the statements contained various representations to shareholders regarding the level of due diligence investigations the Board performed in weighing the Amended Merger Agreement.

130.     Defendants Angle, Ali, Golz, Manolis, Miller, and Stacy caused the Amended Merger Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Merger would render Amazon as a dominant player in the RVC market, to which both federal and international antitrust regulators would likely scrutinize; (2) iRobot's due diligence in reviewing the Merger was wholly insufficient and ignored significant risks pertinent to regulatory approval

39

of the Merger; (3) iRobot's statements concerning and emphasizing the likelihood of closing the Merger were significantly overstated; and (4) the Company failed to maintain adequate internal controls. As a result of the forgoing, the Company's public statements were materially false and misleading at all relevant times.

131.    As a result of Individual Defendants Angle, Ali, Golz, Manolis, Miller, and Stacy causing the Amended Merger Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, in favor of: (1) the proposal to approve and adopt the Amended Merger Agreement; and (2) the compensation proposal, on a non-binding, advisory basis.

### October 12, 2023 Form 8-K

132.    On October 12, 2023, iRobot filed a current report on Form 8-K with the SEC, disclosing the stockholder vote ratifying the Amended Merger Agreement, which occurred the same day ("October 12th 2023 8-K"). The October 12th 2023 8-K stated that, in relevant part, that "the transactions contemplated by the amended merger agreement are expected to close promptly after all regulatory clearances have been received and subject to the satisfaction of other customary closing conditions." The October 12th 2023 8-K did not disclose any further pre-clearance regulatory issues, thereby downplaying the risk that applicable regulators, both domestic and international, were likely to not approve the Merger.

### November 7, 2023 Q3 2023 10-Q

133.    On November 7, 2023, iRobot released its third quarter 2023 financial results in a Form 10-Q filing with the SEC ("Q3 2023 10-Q"), in which the Company stated with respect to Merger Agreement contingencies, the same statements found in ¶ 124 *supra*, downplaying the regulatory risks the Amended Merger Agreement faced.

134.    The Q3 2023 10-Q was signed by Defendants Angle and Zeiler and contained SOX

certifications signed by Defendants Angle and Zeiler, attesting to the accuracy of the financial

statements contained within, the disclosure of any material changes to the Company's internal

controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

***November 27, 2023 EC Press Release***

135.    On November 27, 2023, the truth continued to emerge when the EC issued a press

release entitled "Commission sends Amazon Statement of Objections over proposed acquisition

of iRobot," which declared that "[t]he [EC] has informed Amazon of its preliminary view that its

proposed acquisition of iRobot may restrict competition in the market for [RVCs]." Specifically,

the EC listed a series of objections stating, in relevant part:

**The Statement of Objections**

On 6 July 2023, the Commission opened an in-depth investigation to assess if
Amazon's acquisition of iRobot may (i) ***restrict competition in the market for the
manufacturing and supply of RVCs***; and (ii) allow Amazon to strengthen its
position in the ***market for online marketplace services to third-party sellers*** (and
related advertising services) ***and/or other data-related markets***.

As a result of this in-depth investigation, the Commission is concerned that Amazon
may restrict competition in the ***European Economic Area ('EEA')-wide and/or
national markets for RVCs, by hampering rival RVC suppliers' ability to
effectively compete.*** In particular, the Commission found that:

- Amazon may have the ***ability and the incentive to foreclose iRobot's rivals by
  engaging in several foreclosing strategies*** aimed at preventing rivals from
  selling RVCs on Amazon's online marketplace and/or at degrading their access
  to it. This may include: (i) delisting rival RVCs; (ii) reducing visibility of rival
  RVCs in both non-paid (i.e., organic) and paid results (i.e., advertisements)
  displayed in Amazon's marketplace; (iii) limiting access to certain widgets (e.g.
  'other products you may like') or certain commercially-attractive product labels
  (e.g. 'Amazon's choice' or 'Works With Alexa'); and/or (iv) directly or
  indirectly raising the costs of iRobot's rivals to advertise and sell their RVCs
  on Amazon's marketplace. ***Amazon may have the ability to foreclose iRobot's
  rivals because Amazon's online marketplace is a particularly important
  channel to sell RVCs*** in France, Germany, Italy, and Spain. RVC customers in

these countries particularly rely on Amazon both in terms of product discovery as well as for their final purchasing decision.

- ***Amazon may have the incentive to foreclose iRobot's rivals because it may be economically profitable to do so***. The merged entity would likely gain more from additional sales of iRobot RVCs, than it would lose from fewer sales of iRobot's rivals and other related products on Amazon. Such gains include benefits from additional data gathered from iRobot's users.

- Such foreclosure strategies could restrict competition in the market for RVCs, leading to higher prices, lower quality, and less innovation for consumers.

The [EC] has conducted a wide-ranging investigation to understand the market and the potential impact of the deal. This investigation has included, among others, analysing internal documents provided by the parties and gathering views from market participants such as suppliers of RVCs and other smart home devices, as well as from providers of online sales channels.

136.    On this news, iRobot's stock price fell by approximately 17.19%, or $7.13, from a closing price of $41.48 per share on November 24, 2023, to close the next trading day at $34.35 per share on November 27, 2023.

### *January 10, 2024 POLITICO Article*

137.    On January 10, 2024, *POLITICO* reported, along with other news outlets, during intraday trading hours, that Amazon planned on refusing to issue any concessions to the EC to appease the EC's concerns detailed in the EC Press Release. The *POLITICO* article, entitled "Amazon skips concessions to EU on iRobot deal," reported the following statement, in relevant part:

Amazon didn't offer concessions to the [EC] to try to garner approval for its planned $1.4 billion takeover of robot vacuum cleaner maker iRobot.

The European Union's webpage on the deal shows that the companies didn't make an offer by the end of the day on Wednesday, its last chance to tackle European Union objections that Amazon could hamper rival vacuum cleaners' sales on Amazon's online marketplace. Regulators have said the sales platform is a particularly important sales channel for the product.

*        *        *

An Amazon spokesperson declined to comment.

*iRobot's [CEO Defendant] Angle said in a statement that the company "continues to work cooperatively with the [EC] and other regulators in their review of the merger ... We remain excited about the opportunity to work together with Amazon to continue innovating, bringing valuable products to customers and making their lives easier."*

138.    On this news, iRobot's stock price fell by approximately 19.77%, or $7.33, from a closing price of $37.08 per share on January 9, 2024, to close the next trading day at $29.75 per share on January 10, 2024.

139.    The statements referenced in ¶¶ 121-125; and 132-134 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Merger would render Amazon as a dominant player in the RVC market, to which both federal and international antitrust regulators would likely scrutinize; (2) iRobot's due diligence in reviewing the Merger was wholly insufficient and ignored significant risks pertinent to regulatory approval of the Merger; (3) iRobot's statements concerning and emphasizing the likelihood of closing the Merger were significantly overstated; and (4) the Company failed to maintain adequate internal controls. As a result of the forgoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

*January 18, 2024 Wall Street Journal Article*

140.    On January 18, 2024, after the markets closed, the *Wall Street Journal* published an article titled "EU Commission Intends to Block Amazon's iRobot Acquisition," (the "WSJ Article"). The WSJ Article revealed that the EC intended to block the Merger, in relevant part:

The European Union's competition watchdog intends to block Amazon's $1.7 billion bid to purchase Roomba maker iRobot, people familiar with the matter said.

Competition officials from the [EC], the bloc's executive body, met Thursday with representatives from Amazon to discuss the deal, one of those people said. Amazon was told during the meeting that the deal was likely to be rejected, the person said. Amazon declined to comment.

The plan to reject the deal would still need formal approval from the commission's 27 top political leaders before a final decision can be issued. Historically, that process is unlikely to overrule a recommendation from the bloc's competition commissioner, Margrethe Vestager. The commission has a Feb. 14 deadline for its final decision.

***January 18, 2024 Bloomberg Article***

141.    That same day, on January 18, 2024, after the markets closed, *Bloomberg* published

an article titled "Amazon's $1.4 Billion iRobot Deal to Be Blocked by EU Antitrust Watchdog,"

(the "Bloomberg Article"). The Bloomberg Article reflected the same statements made in the WSJ

Article.

142.    During the next day's trading hours, the Bloomberg Article was updated to reflect

that the FTC was drafting a lawsuit to enjoin the Amended Merger Agreement, stating, in relevant

part:

The deal is likely to face opposition in the US as well. According to people familiar with the matter, the [FTC] has been drafting a lawsuit that would seek to block the acquisition. The FTC's three commissioners haven't yet voted on a challenge nor had a final meeting with Amazon to discuss the potential case, said the people, who asked not to be named discussing an ongoing probe.

143.    On this news, iRobot's stock price fell by approximately 26.93%, or $6.36, from a

closing price of $23.62 per share on January 18, 2024, to close at $17.26 per share on January 19,

2024.

***January 29, 2024 Joint Press Release Terminating the Amended Merger Agreement***

144.    On January 29, 2024, the truth fully emerged when iRobot and Amazon issued a joint press release during pre-market hours that revealed iRobot and Amazon terminated the Amended Merger Agreement. The joint press release, titled, "Amazon and iRobot Agree to Terminate Pending Acquisition," stated, in relevant part:

> Today Amazon . . . and iRobot . . . announced that they have entered into a mutual agreement to terminate their previously announced acquisition agreement, originally signed on August 4, 2022, under which Amazon would have acquired iRobot for cash consideration.

*          *          *

> The companies have signed a termination agreement that resolves all outstanding matters from the transaction, including Amazon paying iRobot the previously agreed upon termination fee.

***January 29, 2024 Operational Restructuring Press Release***

145.    That same day, on January 29, 2024, iRobot issued its own press release during pre-market hours, titled, "iRobot Announces Operational Restructuring Plan to Position Company for the Future" ("January 29th Restructuring Press Release").

146.    The January 29th Restructuring Press Release reported that iRobot planned to reduce its workforce by "approximately 350 employees, which represents 31 percent of the Company's workforce as of December 30, 2023," and that, "[a]s part of this workforce reduction, iRobot expects to record restructuring charges totaling between $12 million and $13 million, primarily for severance and related costs, over the first two quarters of 2024, with the majority of the restructuring charges anticipated in the first quarter of 2024."

147.    In addition to the foregoing, the January 29th Press Release revealed that, "[c]oncurrent with the implementation of its operational restructuring plan . . . [Individual Defendant] Angle, Chairman of the Board . . . and CEO, has stepped down as Chairman and CEO."

***January 29, 2024 Reuters Article***

148.    Later in the same day, *Reuters* published another article, this time titled "Amazon, Roomba-parent iRobot abandon $1.4 billion merger deal," revealing, *inter alia*, that FTC staff had notified Amazon about a week earlier that the FTC planned to block the Merger, stating in relevant part:

> Separately, the [FTC] was poised to reject Amazon's deal before the companies announced they were abandoning it, a source told Reuters.

*          *          *

> The FTC staff met with Amazon last week to inform them they planned to recommend the commission vote to sue to block the acquisition, the source added, saying the commission was set to hold a final meeting on Monday with Amazon before the commission could have voted to approve a legal challenge to the merger.

149.    On this news, iRobot's stock price fell 8.77%, or $1.49, from a closing price of $16.99 per share on January 26, 2024, to close at $15.50 per share the next trading day on January 29, 2024.

## DAMAGES TO IROBOT

150.    As a direct and proximate result of the Individual Defendants' conduct, iRobot has lost and expended, and will continue to lose and expend, many millions of dollars.

151.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

152.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

153. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

154. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

155. As a direct and proximate result of the Individual Defendants' conduct, iRobot has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## **DERIVATIVE ALLEGATIONS**

156. Plaintiff brings this action derivatively and for the benefit of iRobot to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of iRobot, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

157. iRobot is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

158.     Plaintiff is, and has been at all relevant times, a shareholder of iRobot. Plaintiff will adequately and fairly represent the interests of iRobot in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

159.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

160.     A pre-suit demand on the Board of iRobot is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Ali, Golz, Manolis, Miller, and Stacy (the "Director-Defendants") and non-parties Dr. Ruey-Bin Kao and Gary Cohen (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

161.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

162.     As Board members of iRobot charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members

of iRobot, the Director-Defendants must have been aware of the material facts regarding the issues plaguing iRobot's risk management systems and accounting procedures.

163.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted iRobot to issue materially false and misleading statements. Specifically, the Director-Defendants caused iRobot to issue false and misleading statements which were intended to make iRobot appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

164.    Additional reasons that demand on Defendant Ali is futile follow. Defendant Ali has served as a Company director since August 2015. He also serves as a member of the Compensation and Talent Committee and serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Ali received and continues to receive handsome compensation for his role as a director, including $272,468 in the 2023 Fiscal Year. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Ali personally signed the 2022 10-K, which contained materially false and misleading statements and omissions. Moreover, Defendant Ali solicited the Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement, all of which contained material misrepresentations and omissions and which led to shareholders approving the Merger. The 2023 Proxy Statement led to the re-election of some of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the

Company. For these reasons, too, Defendant Ali breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand on Defendant Golz is futile follow. Defendant Golz has served as a Company director since November 2021. She also serves as the Chair of the Audit Committee. Defendant Golz received and continues to receive handsome compensation for her role as a director, including $279,968 in the 2023 Fiscal Year. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Golz personally signed the 2022 10-K, which contained materially false and misleading statements and omissions. Moreover, Defendant Golz solicited the Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement, all of which contained material misrepresentations and omissions and led to shareholders approving the Merger. The 2023 Proxy Statement led to her reelection, allowing her to continue to breach her fiduciary duties to the Company. For these reasons, too, Defendant Golz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Manolis is futile follow. Defendant Manolis has served as a Company director since July 2019. She also serves as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Manolis received and continues to receive handsome compensation for her role as a director, including $277,468 in the 2023 Fiscal Year. As a trusted, long-time Company director,

she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Manolis personally signed the 2022 10-K, which contained materially false and misleading statements and omissions. Moreover, Defendant Manolis solicited the Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement, all of which contained material misrepresentations and omissions and led shareholders to approve the Merger. The 2023 Proxy Statement led to the re-election of some of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Manolis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since September 2016. He has also served as the Chair of the Board since January 2024. Additionally, he serves as a member of the Audit Committee. He also formerly served as the Chair of the Audit Committee, and the Chair of the Transaction Committee during the Relevant Period. Defendant Miller received and continues to receive handsome compensation for his role as a director, including $292,468 in the 2023 Fiscal Year. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Miller personally signed the 2022 10-K, which contained materially false and misleading statements and omissions.

Moreover, Defendant Miller solicited the Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement, all of which contained material misrepresentations and omissions and led to the shareholders approving the Merger. The 2023 Proxy Statement led to his reelection, allowing him to continue to breach his fiduciary duties to the Company. For these reasons, too, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Stacy is futile follow. Defendant Stacy has served as a Company director since August 2014. She also serves as a member of the Nominating and Corporate Governance Committee, as the Chair of the Compensation and Talent Committee, and served as a member of the Transaction Committee during the Relevant Period. Defendant Stacy received and continues to receive handsome compensation for her role as a director, including $279,968 in the 2023 Fiscal Year. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Stacy personally signed the 2022 10-K, which contained materially false and misleading statements and omissions. Moreover, Defendant Stacy solicited the Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement, all of which contained material misrepresentations and omissions and led to the shareholders approving the Merger. The 2023 Proxy Statement led to her reelection, allowing her to continue to breach her fiduciary duties to the Company. For these reasons, too, Defendant Stacy

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169.     Additional reasons that demand on the Board is futile follow.

170.     Defendants Golz (as current Chair), Manolis, and Miller (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Defendant Miller was the Chair of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

171.     All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

172.     In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

173.     The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

174.     The acts complained of herein constitute violations of fiduciary duties owed by iRobot's officers and directors, and these acts are incapable of ratification.

175.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of iRobot. If there is a directors' and officers'

liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of iRobot, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

176.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause iRobot to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

177.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

181.    Under the direction and watch of the Individual Defendants, the Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement all failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

182.    The Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement all failed to disclose that: (1) the Merger would render Amazon as a dominant player in the RVC market, to which both federal and international antitrust regulators would likely scrutinize; (2) iRobot's due diligence in reviewing the Merger was wholly insufficient and ignored significant risks pertinent to regulatory approval of the Merger; (3) iRobot's statements concerning and emphasizing the likelihood of closing the Merger were significantly overstated; and (4) the

Company failed to maintain adequate internal controls. As a result of the forgoing, the Company's public statements were materially false and misleading at all relevant times.

183.    In the exercise of reasonable care, the Individual Defendants knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement including, but not limited to, the re-election of Defendants Golz, Miller, and Stacy to the Board.

184.    The false and misleading elements of the 2023 Proxy Statement led Company shareholders to, *inter alia*, (1) re-elect Individual Defendants Golz, Miller, and Stacy to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the appointment of PwC as the Company's independent public accountants for 2023 Fiscal Year; (3) approve the non-binding, advisory vote on the compensation of the Company's named executive officers; and (4) to set, on an advisory basis, the frequency of future non-binding, advisory votes on the compensation of iRobot's named executive officers to ever year.

185.    The false and misleading elements of the Merger Proxy Statement and the Amended Merger Proxy Statement led Company shareholders to ratify, respectively and *inter alia*, (1) the Merger Agreement between iRobot and Amazon, and (2) the Amended Merger Agreement between iRobot and Amazon.

186.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Merger Proxy Statement, the 2023 Proxy Statement, and the Amended Merger Proxy Statement.

187.     Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

188.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of iRobot's business and affairs.

190.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

191.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of iRobot.

192.     In breach of their fiduciary duties owed to iRobot, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Merger would render Amazon as a dominant player in the RVC market, to which both federal and international antitrust regulators would likely scrutinize; (2) iRobot's due diligence in reviewing the Merger was wholly insufficient and ignored significant risks pertinent to regulatory approval of the Merger; (3) iRobot's statements concerning and emphasizing the likelihood of closing the Merger were significantly overstated; and (4) the Company failed to maintain adequate internal controls. As a result of the forgoing, the Company's public statements were materially false and misleading at all relevant times.

193.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

194.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

195.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of iRobot's securities.

196.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of iRobot's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

197.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

198.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, iRobot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

199.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

### THIRD CLAIM
### Against Individual Defendants for Unjust Enrichment

200.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, iRobot.

202.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from iRobot that was tied to the performance or artificially inflated valuation of iRobot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

203.    Plaintiff, as a shareholder and a representative of iRobot, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

204.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

205.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused iRobot to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

207.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

208.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

209.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

210.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of iRobot in a manner consistent with the operations of a publicly held corporation.

211.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, iRobot has sustained and will continue to sustain significant damages.

212.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

213.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

### SIXTH CLAIM
**Against Individual Defendants for Abuse of Control**

214.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence iRobot, for which they are legally responsible.

216.    As a direct and proximate result of the Individual Defendants' abuse of control, iRobot has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

217.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

### SEVENTH CLAIM
**Against Defendants Angle and Zeiler for Contribution Under Sections 10(b) and 21D of the Exchange Act**

218.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

219.    iRobot and Defendants Angle and Zeiler are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Angle's and Zeiler's willful and/or reckless violations of their obligations as officers and/or directors of iRobot.

220.     Defendants Angle and Zeiler, because of their positions of control and authority as officers and/or directors of iRobot, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of iRobot, including the wrongful acts complained of herein and in the Securities Class Action.

221.     Accordingly, Defendants Angle and Zeiler are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

222.     As such, iRobot is entitled to receive all appropriate contribution or indemnification from Defendants Angle and Zeiler.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of iRobot, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to iRobot;

(c)     Determining and awarding to iRobot the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing iRobot and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect iRobot and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions

for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions

as may be necessary to ensure proper corporate governance policies:

                1.  a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and

guidelines of the board;

                2.  a provision to permit the shareholders of iRobot to nominate at least four

candidates for election to the Board; and

                3.  a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

        (e)   Awarding iRobot restitution from Individual Defendants, and each of them;

        (f)   Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)   Granting such other and further relief as the Court may deem just and

proper.


Dated: June 8, 2024

                         **THE BROWN LAW FIRM, P.C.**

                         */s/    John Coyle IV_____*
                         John Coyle IV
                         Timothy Brown
                         767 Third Avenue, Suite 2501
                         New York, NY 10017
                         Telephone: (516) 922-5427
                         Facsimile: (516) 344-6204
                         Email: jcoyle@thebrownlawfirm.net
                                tbrown@thebrownlawfirm.net

                         *Counsel for Plaintiff*